**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MARVIN BETHEA | ) | |
|     808 Myrna Drive | ) | |
|     West Hempstead, New York  11552, | ) | |
| | ) | |
| MICHAEL L. ROBERTS | ) | |
|     1020 Kirkwood Avenue | ) | |
|     Des Moines, Iowa  50315, | ) | |
|         and | ) | |
| | ) | |
| BONNIE J. GIEBFRIED | ) | Civil Action No. _____ |
|     45 West 18th Street | ) | |
|     Huntington Station, NY  11746, | ) | |
| | ) | |
|         Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ERIC H. HOLDER, JR. | ) | |
|     Attorney General of the United States | ) | |
|     United States Department of Justice | ) | |
|     950 Pennsylvania Avenue, NW | ) | |
|     Washington, DC  20530-0001, | ) | |
| | ) | |
|         Defendant. | ) | |
| _____ | ) | |

**COMPLAINT**

1.     Plaintiffs Marvin Bethea, Michael Roberts, and Bonnie Giebfried (hereafter "Applicants"), by and through counsel, hereby move this Court to compel Defendant United States Attorney General Eric H. Holder, Jr. and the United States Department of Justice, Office of Justice Programs, Bureau of Justice Assistance and its employees, to perform mandatory duties owed to the Applicants arising under Public Law 107-37 and the Public Safety Officers' Benefit Act ("PSOBA") at 42 U.S.C. §3796c-1 and (collectively hereafter "Fast Track"). Those mandatory duties are to 1) timely process the applications for PSOBA benefits under the Fast Track provision by issuing an initial determination letter so that they can pursue the processing

of their claims, and 2) timely process their applications as required after issuance of those initial

determination letters.   This Complaint is necessitated by Defendant's extraordinary

administrative delay in processing the Fast Track applications.  This Complaint does ask the

Court to review the merits of the Applications.

2.      The Applicants seek relief in the form of an order 1) finding that the Defendant

and the U.S. Department of Justice violated the federal statutes by failing to timely process the

Fast Track applications, 2) compelling the Defendant and the U.S. Department of Justice to

timely process the Applications, including issuing an initial determination letter as to their claims

within 15 days, 3) after issuing the initial determination, compelling the Defendant and the U.S.

Department of Justice to timely process the Applications on a defined schedule, and until the

claim process is exhausted, 4) declaring that this Court retains jurisdiction to enforce such order

should the Defendant and the U.S. Department of Justice fail to timely process the Applications

as ordered,  and 5) an award of all attorney fees and costs expended in bringing this action.

## JURISDICTION AND VENUE

3.      The Applicants bring this action under 28 U.S.C. §1361, which vests this Court

with original jurisdiction of any action in the nature of mandamus to compel an officer or

employee of the United States or any Agency thereof to perform a duty owed to the Applicants.

Defendant owes a duty to the Applicants under the Administrative Procedure Act, to "conclude a

matter" presented to it "within a reasonable time," 5 U.S.C. § 555(b), and a reviewing court may

"compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1);  In re

Am. Rivers & Idaho Rivers United, 372 F.3d 413, 418 (D.C. Cir. 2004).  Defendant also owes a

ministerial duty to the Applicants to expeditiously process their applications for disability

benefits under the PSOBA, and specifically under the expedited processing provisions applicable to the Applicants.  Public Law 107-37 and 42 U.S.C. §3796c-1.

4.      The Applicants also request declaratory relief under the Declaratory Judgment Act,  28 USCS § 2201, which vests this Court with jurisdiction in a case of actual controversy within its jurisdiction – here the request for mandamus relief.  The Act states that, in a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.   Walpin v. Corp. for Nat'l, & Cmty. Serv., 718 F. Supp. 2d 18, 24 (D.D.C. 2010).

5.      Venue is proper pursuant to 28 U.S.C. §1391(e)(1) and (2), as Defendant is the highest officer of the United States Department of Justice, an executive agency of the United States, located in the District of Columbia, and the events or omissions giving rise to the claims substantially occurred within the District of Columbia.

## THE PARTIES

6.      On September 11, 2001, the Applicants were each employed by private hospitals participating in the New York City Voluntary Hospital system.  That system provides essential emergency response public services to the City of New York through the Fire Department of New York ("FDNY") 911 emergency dispatch system.  On the morning of September 11, 2001, the Applicants were each dispatched by FDNY  to assist victims of the terrorist attacks on the World Trade Center in lower Manhattan.  Each Applicant properly followed those orders and was present at the World Trade Center site when the north and south towers fell.  Each Applicant was severely physically and emotionally injured that day while performing their official duties. The direct and proximate result of the catastrophic personal injuries suffered by the Applicants is

that they are totally and permanently disabled, as determined by numerous physicians and numerous state and federal agencies.  Those determinations found that the Applicants can no longer be employed.

7.      Marvin Bethea, currently a resident of West Hempstead, New York, was a licensed paramedic employed by St. Vincent's Catholic Medical Center-St. John's Hospital in New York City, NY on September 11th.   On that morning, as a result of the terrorist attack and the collapse of the World Trade Center towers, Bethea suffered serious injuries in his selfless performance of his official duties.  He currently suffers from chronic lung disorder and other ailments, and has not worked any job since January 8, 2004 due to those injuries.  During the week of September 11, 2010, Mr. Bethea suffered a life-threatening respiratory attack, and since then has been significantly physically impaired.

8.      Michael Roberts, currently a resident of Des Moines, Iowa, was a licensed paramedic  employed by New York Presbyterian Hospital, in New York City, NY on September 11, 2001.  When the World Trade Center towers fell that day, Mr. Roberts became trapped and suffered serious injuries, including a significant leg injury.  He emergency vehicle was completely crushed.  Mr. Roberts officially stopped working after November 30, 2001 due to that permanent disability caused as he heroically responded to the assist victims.

9.       Bonnie Giebfried, currently a resident of Huntington Station, New York, was a certified emergency medical technician working on an ambulance crew stationed at Flushing Hospital Medical Center in Queens, New York City, NY on the morning of September 11, 2001 when she was dispatched by the FDNY 911 system to respond to the World Trade Center attacks.  When the south tower of the World Trade Center fell, Ms. Giebfried was buried by debris in her ambulance.  Despite injuries to her neck and back, she bravely continued to assist

with the injuries of other, when she was injured further when the north tower fell.  Ms. Giebfried

suffered severe injuries, including three asthma attacks over the course of the day, and eventually

was rendered unconscious.  Ms. Giebfried stopped working in April 2004 due to her injuries.

10.     Eric Holder is the Attorney General of the United States, and heads the United

States Department of Justice in Washington, DC ("Agency").  The Agency's Bureau of Justice

Assistance ("BJA") administers the PSOBA.

## PUBLIC SAFETY OFFICERS' BENEFIT ACT
## AND FAST TRACK

11.     On September 13, 2001, two days after the horrific terrorist attack on the United

States, Congress unanimously passed  H.R. 2882/S. 1422.  The sole purpose was to  expedite

awards of existing federal disability and death benefits to public safety officers and their families

made eligible from injuries suffered as a result of the attacks two days prior.  The purposes were

described by two co-sponsors, U.S. Representative Jerrold Nadler (here describing safety officers

who perished), and Senator Patrick Leahy (VT) on September 13, 2001:

> I take no pride in introducing this legislation, and if ever there were a bill I drafted I wish
> were not needed, this would be it. ….
>
> Putting the safety and well-being of others well above their own, public safety officers
> performed the most courageous acts; but, sadly, probably about 300 New York City
> firefighters and EMS workers and EMT volunteers and people paid with their lives as
> well as 60 or 70 New York City and Port Authority police officers. …
>
> Just as our public safety officers stand up for us, we must now stand up for them in this
> time of tragedy. This legislation directs the Department of Justice to expedite the
> payment process for the families of those affected by Tuesday's events….
>
> Mr. Speaker, I want to express my confidence that the Department of Justice and the
> Department of the Treasury will join the Congress in treating the families of these heroic
> public servants, these heroic police officers, fire officers and emergency medical
> technicians and so forth, in treating their families with the respect they are due from a
> grateful Nation and will speed the help that they need and deserve as quickly and as
> painlessly as possible.

Representative Jerrold Nadler (8th – NY), September 13, 2001, 147 Cong Rec H 5602.

> Mr. President, I commend the Senators from New York for their leadership on this
> legislation to streamline the Public Safety Officers' Benefits application process [for] the
> family members of fire fighters, emergency medical technicians and rescue workers who
> perished or suffered great injury in the aftermath of the tragic terrorist events of this
> week. I am proud to be an original cosponsor of S.1422.

Senator Patrick Leahy (VT), Chairman of the Senate Judiciary Committee, September 13, 2001,

147 Cong Rec S 9409.

12.     The new provision, amending the existing PSOBA, was signed into law by

President George W. Bush a week later.  Public Law 107-37.   It requires the U.S. Department of

Justice, which administers PSOBA, to provide death and disability benefits within 30 days of

being provided an eligible application.  That application must include a certificate from a public

agency that employed the safety office as defined under the law, certifying the officer's total and

permanent disability or death as a result of the September 11th attacks.  The amendment further

places the burden of proof as to the assertions in the certifications on BJA, as opposed to the

applicants.  This represented a change from the regular application procedure, under which the

burden of proof remained with the applicant.

13.     On October 26, 2001 these new expedited processing provisions were expanded

to apply to public safety officers who were rendered totally and permanently disabled or were

killed in any terrorist attack .  42 U.S.C. §3796c-1 (collectively with  Public Law 107-37 - "Fast

Track").

14.     Under Fast Track, an applicant for disability or death benefits submits to BJA a

certification

> by a public agency that a public safety officer employed by such agency was killed or
> suffered a catastrophic injury producing permanent and total disability as a direct and

proximate result of a personal injury sustained in the line of duty... in connection with prevention, investigation, rescue, or recovery efforts related to a terrorist attack...[1]

BJA must authorize payments to qualified beneficiaries within 30 days of receipt of the certification.[2]  BJA must issue a writing to the applicant describing its finding of eligibility or, if it finds the applicant ineligible, must provide its reasoning in writing ("initial determination"):

> Upon making a finding of eligibility, the Bureau shall notify each claimant of its disposition of his or her claim. In those cases where the Bureau has found the claimant to be ineligible for a benefit, the Bureau shall specify the reasons for the finding. The finding shall set forth the findings of fact and conclusions of law supporting the decision....[3]

15.     If BJA finds the applicant ineligible for the benefit, after receiving the initial determination, the applicant is afforded the opportunity to present evidence at a hearing before a BJA hearing officer to support a determination of eligibility.[4]  After such hearing, upon a determination by the hearing officer, if the applicant is found eligible, BJA is still authorized to overturn the hearing officers' determination ("final determination").[5]  If BJA issues a final determination denying the benefit, the benefit applicant may proceed to federal court to challenge BJA's final determination.  See, e.g. Winuk v. United States, 77 Fed. Cl. 207 (Fed. Cl. 2007) (appeal of Fast Track application by family of deceased September 11, 2001 in which BJA's initial determination denied the applicant the PSOBA benefit as ineligible, and following

---

[1]  42 U.S.C. §3796c-1 (2005).   This language was amended in 2013 Dale Long Act, *infra,* but the amendment was made inapplicable to  rescue and ambulance workers injured prior to June 1, 2009.

[2] Id.

[3] 28 C.F.R. § 32.23 (2005).  Plaintiffs and BJA dispute which version of PSOBA is applicable to BJA's review of the Applications, given certain regulatory and statutory changes in 2006 and 2013.  However, the administrative procedures for obtaining an initial and final determination from BJA, the issue in this complaint, generally have remained consistent over the past decade.

[4] 28 C.F.R.§ 32.24 (2005).

[5] 28 C.F.R.§ 32.24(h) (2005).

a hearing the hearing officer reversed and found the applicant eligible, and ultimately BJA

reversed the hearing officer in its final determination and found the applicant ineligible).[6]

16.     BJA has issued at least two initial determinations in the past five years denying

PSOBA disability benefits to employees of voluntary hospitals participating in the FDNY 911

system, who were injured responding to the September 11, 2001 terrorist attacks.  Those initial

determinations were four pages and five pages in length.  See Attachment,  Redacted 2009 BJA

Initial Determination Letter to September 11, 2001 First Responder.

## STANDARD OF REVIEW

17.     Mandamus is an extraordinary remedy reserved for extraordinary circumstances,

Id., and mandamus generally will not issue unless there is a clear right to the plaintiff for the

right sought, a plainly defined and non-discretionary duty on the part of the defendant to honor

that right, and no other remedy, judicial or administrative, available.  Northern States Power

Corp. v. U.S. Dept. of Energy, 128 F.3d 754, 758 (D.C. Cir. 1997).   An administrative agency's

unreasonable delay presents such a circumstance because it signals the "breakdown of regulatory

processes." In re Am. Rivers & Idaho Rivers United, 372 F.3d at 418, citing Cutler v. Hayes, 260

U.S. App. D.C. 230, 818 F.2d 879, 897 n.156 (D.C. Cir. 1987).

18.     The court analyzes unreasonable delay claims based on the following criteria:  (1)

the time agencies take to make decisions must be governed by a "rule of reason";  (2) where

Congress has provided a timetable or other indication of the speed with which it expects the

---

[6] Under current law, an appeal of a final  determination by BJA is made directly to the U.S.
Court of Appeals for the Federal Circuit.  42 USCS § 3796c-2 (2014).  Plaintiffs and BJA
dispute which version of PSOBA is applicable to BJA's review of the Applications, given certain
regulatory and statutory changes in 2006 and 2013.  However, the administrative procedures for
obtaining an initial and final determination from BJA, the issue in this complaint, generally have
remained consistent over the past decade.

agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." Id., quoting In re United Mine Workers of Am. Int'l Union, 338 U.S. App. D.C. 56, 190 F.3d 545, 549 (D.C. Cir. 1999).

## **STATEMENT OF FACTS**

19.     On September 29, 1976, the PSOBA became law (P.L. 94-30), establishing a program that provides death benefits to families of certain public safety officers killed in the line of duty.

20.     By November 29, 2000, PSOBA had been amended to make eligible a member of a rescue squad or ambulance crew that serves a public agency, and public safety officers permanently and totally disabled as a result of a catastrophic personal injury received in the line of duty.

21.     According to the BJA website, the current amount of the PSOBA benefit is $333,604.68.

22.     In 2001 the Fire Department of New York City ("FDNY") operated the official emergency dispatch 911 system for New York City.  FDNY relied on a system of voluntary hospitals that provided ambulance and rescue crews to respond to an estimated 40 percent of the FDNY dispatches requesting emergency assistance.

23.     In 2001 FDNY referred to the employees of the voluntary hospitals participating in the FDNY 911 system as "members" of its  pre-hospital emergency care 911 system.

24.     On September 11, 2001, Marvin Bethea, Michael Roberts, and Bonnie Giebfried were members of the FDNY pre-hospital emergency care services employed by private sector voluntary member hospitals.

25.     The Applicants were licensed by the State of New York to serve within the 911 system, and were required to follow the FDNY rules, travel in vehicles carrying the FDNY logo, and respond to FDNY dispatches for emergency response.

26.     On the morning of September 11, 2001, four commercial jetliners were hijacked in the worst terrorist attack on the U.S. in its history.  Two of those jetliners flew into the World Trade Center north and south towers in lower Manhattan, New York City.

27.     That morning, the Applicants were officially dispatched by the FDNY to provide emergency response assistance to those injured in attacks on the World Trade Center.

28.     On September 11, 2001, at least 39 percent of the FDNY's EMS resource commitment to the World Trade Center incident originated with private sector voluntary hospitals participating in the FDNY 911 system.

29.     On September 11, 2001, after the Applicants arrived at the World Trade Center site to assist the injured, the north and south towers collapsed, depositing tons of hazardous substances in the air and on the ground, in the direct vicinity where the Applicants were assisting the injured.

30.     The Applicants suffered severe physical and psychological injuries from impact of the collapse of the World Trade Towers.

31.     On September 13, 2001, Congress passed Public Law 107-37, creating a new expedited application procedure for death and disability PSOBA benefits, requiring the federal government to provide benefits within 30 days of receipt of a certification from a public agency that employed them, certifying the officer's benefit eligibility.  The certification created a prima facie assumption of eligibility, placing the burden on the BJA to disprove.  This expedited provision  applied exclusively to public safety officers killed, and the families of public safety officers injured, in the September 11, 2001 attacks.

32.     On September 18, 2001, President George W. Bush signed P.L. 107-37 into law.

33.     On October 1, 2001, BJA wrote to the President of the American Ambulance Association that private sector workers would be deemed eligible public safety officers under PSOBA and P.L 107-37, pursuant to a certification from a government agency.

34.     On October 26, 2001, the U.S. Patriot Act was passed and extended the 30-day expedited processing rule and burden shifting provisions of P.L. 107-37 to apply to any public safety officers and their families sufficiently injured or killed in responding to any terrorist attack on the United States that occurs after January 1, 2001 (collectively with P.L. 107-37 "Fast Track").

35.     In 2002, under Fast Track, BJA provided PSOBA benefits to the families of at least ten private sector employees who were killed in the September 11th attacks, including four members of the FDNY pre-hospital emergency care services who had been employees of private sector voluntary hospitals when they perished.  This included two employees of New York Presbyterian Hospital, which was Michael Roberts' employer on September 11, 2001.

36.     By 2004, each of the Applicants was forced to permanently stop working due to their injuries sustained responding to the September 11, 2001 terrorist attacks.

37.     On December 1, 2006, four members of the United States Congress sent a letter to BJA containing  regular applications (not Fast Track) of Bethea, Roberts, Giebfried, and two other emergency responders to the September 11th attacks for PSOBA benefits.

38.     By January 4, 2008, more than a year later, BJA had not responded to the December 1, 2006 applications.  Five members of Congress urged BJA in a letter to respond to the Applicants, including the four who originally sent the applications.

39.     By July 29, 2008, BJA had still not provided any response to the December 1, 2006 applications.  That day a U.S. Senator wrote to the U.S. Department of Justice regarding BJA's failure to respond to Mr. Bethea and another applicant.

40.     On September 9, 2008, BJA director Hope Janke ("BJA Director") issued the Agency's first response to the applications, although not to the Applicants.  She wrote to the U.S. Senator that at "this time, the PSOB disability claims of Mr. Bethea and [another application] are undergoing review.  If they have any questions, Mr. Bethea and [the other applicant] may contact me directly...."

41.     By June 25, 2009, BJA had not provided any response to the Applicants.

42.     On June 26, 2009, the Applicants informed BJA that they were now represented by counsel, and demanded "immediate written responses" to the applications which had been sent to BJA more that two years earlier.

43.     On July 10, 2009, the BJA Director wrote the first written response to the Applicants and provided documents from the administrative record to their counsel.

44.     On August 15, 2009, the Applicants, through their counsel,[7] inquired if they could apply for the PSOBA benefit under the Fast Track provision.  The BJA Director informed the Applicants that she was unaware of any applicant for PSOBA disability benefits using the Fast Track provision, that all prior Fast Track applicants had been made for death benefits.  She said she would raise that issue with her own counsel.

45.     On or about August 28, 2009, BJA counsel Jason Cooley ("BJA Counsel") contacted the Applicants by phone and confirmed that no applicants for PSOBA disability benefits had ever applied under Fast Track.  As to the requisite certification as to the existence of a total and permanent disability, and certification from their public employer that the injuries were caused in the in the line of duty during a terrorist attack, BJA Counsel said it was not "unreasonable" for BJA to consider a certification signed by a top official from the employing hospital, instead of a public agency, given the Applicants were not employed by an agency.  But he would not confirm that this would satisfy the Fast Track certification requirement.

46.     On September 29, 2009, the Applicants, through their counsel, spoke with BJA Counsel discussed which top executive a the Applicants' former employing hospitals could sign the certification to meet the statutory requirement.

47.     On September 30, 2009,  BJA Counsel informed the Applicants that certain specific documentation would be needed from the hospital for the certifications to be considered complete, but did not commit that if that material was provided the certifications they would be accepted as valid to satisfy the Fast Track benefit requirement.

---

[7] The references to BJA communications with Bethea, Giebfried, and Roberts *infra* refer to communications with their counsel.

48.    On November 12, 2009, Bethea submitted applications for PSOBA benefits under the Fast Track provisions.  Bethea's certification was signed by the chief operating officer of his  employer on September 11, 2001, a  private sector voluntary member hospital participating in the FDNY 911 system.

49.    On December 18, 2009, BJA Counsel informed Bethea that BJA did not find his Fast Track certification to be a valid certification because the materials submitted did not establish the certifying hospital was a public agency, as was necessary to establish a proper certification.   He invited Bethea to submit such documentation establishing it was a public agency prior to BJA making a determination.

50.    On January 5, 2010, BJA Counsel informed the Applicants that if they received a Fast Track certification from FDNY, that BJA might consider this to be a valid Fast Track certification, but he would not commit to it.

51.    On January 14, 2010 Bethea informed BJA Council that he was seeking information to supplement his Fast Track application to specifically meet the requirement that he was a public safety officer under the statute, as a former employee of a  private sector voluntary member hospital that participated in the FDNY 911 system.

52.    At this time the Applicants attempted to obtain a Fast Track certification signed by the FDNY.

53.    On May 11, 2010, FDNY informed the Applicants it would not sign a Fast Track certification for them, especially because the Applicants had never been FDNY employees and FDNY did not find itself to be authorized to determine the level of disability of non-employees.

54.    On June 2, 2010, Bethea submitted supplemental information on his Fast Track application, and Giebfried submitted her initial Fast Track application.  Giebfried's certification

was signed by the president and chief executive officer of her employing  private sector

voluntary member hospital on September 11, 2001.

55.     On July 9, 2010,  BJA Counsel informed Bethea and Giebfried that their Fast

Track applications had not been reviewed, and that BJA was under no obligation to respond to

their applications within 30 days.

56.     On July 20, 2010, BJA Counsel informed the Applicants in a letter that BJA "at

this stage, is unable to conclude it had received" a valid Fast Track certification.  He said he

would take steps to determine if the voluntary member hospitals themselves were "public

agencies" under PSOBA.

57.     The Applicants immediately responded to BJA Counsel that they did not assert

that the hospitals met the definition of a "public agency", but instead asserted that the individual

<u>units</u> of the voluntary hospitals that participated in the FDNY 911 system met that definition, as

"instrumentalities" of a public agency, as defined in PSOBA.

58.     On July 23, 2010, BJA Counsel wrote to the Applicants stating that if they

asserted that the individual hospital <u>units</u> that participated in the FDNY 911 system, and not the

entire hospital,  met the definition of "public agency" under PSOBA, then the Fast Track

certification must be signed by the head of that individual <u>unit</u>, and not of the entire hospital.

59.     In several communications during August 2010, BJA Counsel communicated with

the Applicants whether they could establish that the individual hospital units participating in the

FDNY 911 system were "public agencies."

60.     On August 31, 2010, BJA Counsel informed the Applicants that BJA would reject

a Fast Track certification from the head of the <u>unit</u> of their former employing voluntary member

hospitals that  exclusively responded to FDNY dispatches.   The Applicants informed BJA

Counsel they would then seek a waiver of any applicable rules from Attorney General Holder, and asked BJA not to process the existing Fast Track applications until they received a response from the Attorney General.

61.     On September 7, 2010, the Applicants requested in a letter to Attorney General Holder that he approve the Fast Track applications as valid, or, in the alternative, under a waiver provision in the PSOBA.

62.     On January 11, 2011, after considerable effort, the three Applicants submitted new Fast Track certifications signed by an official heading the <u>unit</u> of each of their former employing voluntary member hospitals that exclusively responded to FDNY dispatches.[8]

63.     On January 14, 2011 the BJA Director informed the Applicants in writing that BJA did not consider any of their Fast Track certifications submitted to be sufficient under the law.  She stated that she would consider an alternative certification that the Applicants might provide.  She responded to the Applicants' waiver request to the Attorney General, denying the waiver.

64.     On February 1, 2011, the Applicants requested in a letter to the BJA Director that her office make an initial determination as to the Fast Track applications ("Applications"),[9] so they could proceed with the administrative process in pursuing their claims.

65.     On February 11, 2011, BJA Counsel wrote to the Applicants, asserting that BJA did not consider their Fact Track certifications to be valid.  BJA Counsel inquired "whether you desire the PSOB Office to now determine those claims filed under P.L. 107-37."

---

[8] For Bethea, that certification was from the former director, because his employing hospital had shut down.  BJA Counsel had stated it would consider a former director as signatory given the status of the hospital.
[9] Hereafter, "Applications" will refer collectively to all of the prior and subsequent Fast Track applications submitted to BJA by the Applicants.

66.     On March 4, 2011, the Applicants again wrote to the BJA Director requesting "that BJA move forward with determinations...."

67.     On April 12, 2011, the Applicants wrote to BJA Director again requesting BJA process their applications, acknowledging that "it seems clear your office has already identified its legal position and therefore it is unclear why there is a delay in processing" them and that the Applicants "look forward to asserting [their] rights in the proper adjudicatory forum."

68.     On May 19, 2011, Applicants verbally demanded that BJA  immediately process their claims.  The BJA Director stated she would "pass on" their demand to BJA Counsel and would find out why no written finding had been issued by BJA. The Applicants also put in writing their demand that BJA issue a written finding so they could "proceed to a hearing on their eligibility," stating "BJA's delay violates the statute in letter and spirit."

69.     By June 24, 2011, the Applicants had not received any response from BJA to their request for formal determinations.

70.     On June 24, 2011, the Applicants moved to approach the Regional Emergency Medical Services Council of New York City (REMSCO) to obtain a Fast Track certification letter to supplement their existing Fast Track Applications.[10]

71.     During the week of June 27, 2011, the Applicants requested that BJA delay the issuance of a written finding as to their eligibility so that they could submit the pending REMSCO Fast Track Certifications.  BJA agreed it would not issue the initial determinations until it received the REMSCO certifications.

---

[10] REMSCO describes itself as a "not-for-profit tax-exempt corporation established as a Regional Emergency Medical Services Counsel...funded by the State of New York and is required to, *inter alia,* coordinate emergency medical services programs within its region and make determination of public need for emergency medical services and ambulance services."

72.     On July 6, 2011, the Applicants submitted Fast Track certifications from REMSCO to BJA, and that they expected to be provided their benefit within 30 days.  They also sent the REMSCO Fast Track Certifications to Attorney General Holder requesting the Applications be approved on the merits, or under the waiver provision.

73.     On August 16, 2011, the BJA Director wrote to the Applicants that their most recent submission "is under review."

74.     On May 11, 2012, the BJA Director wrote to a September 11, 2001 rescue worker, who also had an outstanding Fast Track application, and who had written to President Obama eight months earlier complaining about BJA's refusal to process his application.  BJA Director responded:

> I sincerely apologize for the delay in both this response and an outcome to your claim, and cannot imagine how difficult it must be for you to wait for a final decision on your case.   Because each and every claim is unique, it is difficult to give timelines on when determinations will be made. At times, additional information is needed for claims to be approved according to the law.

75.     On or around August 30, 2012, the Applicants requested by phone that the BJA Director give a status report as to processing of the Applications.

76.     On September 13, 2012, BJA Counsel informed the Applicants that it would not accept the REMSCO Fast Track certifications as valid certifications under the PSOBA.

77.     On December 10, 2012 the Applicants contacted the BJA Director to inquire about the status of the Applications.

78.     On December 12, 2012, BJA Counsel e-mailed the Applicants that he believed there had been a misunderstanding, and that he did not realize that the Applicants now sought an initial determination.  He wrote "If there is no additional information that we should be awaiting from you, then please advise and we will complete the PSOB Office review of your clients'

cases."  The Applicants responded to BJA Counsel the next day "Please process the applications immediately."

79.     On January 2, 2013 Congress passed the "Dale Long Act"[11] which, *inter alia,* clarified that certain private sector ambulance and rescue workers were eligible for the PSOBA benefit, and clarified that the Fast Track certification would be accepted if written by the private sector employer of the public safety officer.   It also contained provisions that might be interpreted as restricting public safety officers' right to the PSOBA benefit.

80.     The Dale Long Act contained language stating that the amendments it made to the PSOBA do not apply to members of a rescue squad or ambulance crew whose injuries were sustained prior to June 1, 2009.[12]  The Applicants' injuries were sustained on September 11, 2001.

81.     On January 23, 2013, the Applicants communicated by e-mail to the BJA Director that they continued to wait for the initial determinations for the Applications and asked that she provide a status report on the Applications immediately.  She responded by e-mail that she had forwarded the Applicants' request to BJA Counsel for an "update."

82.     On January 25, 2013, BJA Counsel responded to the Applicants that "We are working on determinations for your clients." He added BJA was evaluating the impact of the

---

[11] Included in the National Defense Authorization Act for FY 2013, 112 P.L. 239.
[12]  Exceptions.----

    (A) Rescue squads and ambulance crews.--For a member of a rescue squad or ambulance crew (as defined in section 1204(7) of title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended by this section), the amendments made by this Act shall apply to injuries sustained on or after June 1, 2009.

112 P.L. 239 (d)(2)(A).

Dale Long Act on their applications, and "We are trying to complete this evaluation as quickly as possible."

83.     By May 14, 2013, the Applicants had placed several calls with the BJA Director regarding the status of their applications, but she would not respond.

84.     On May 15, 2013, Attorney General Holder publicly announced "significant improvements" to the PSOBA program in response to "a number of concerns" with the program, indicating it is "time to bring about fundamental change."   He promised to "expedite the claims process" and "streamline" it through a reorganization.

85.     On May 24, 2013, the BJA Director finally responded to the Applicants' calls. She informed the Applicants that the reorganization announced by Attorney General Holder involved hiring new counsel that would further delay the processing of the Applications.  The BJA Director predicted the Applicants would receive their determinations within three months.

86.     By August 2013 the Applicants had not heard from BJA, and left phone messages with the BJA Director demanding an update on the status of the Applications.

87.     On August 15, 2013, the BJA Director scheduled a conference call with the Applicants and new BJA Counsel Shanetta Cutlar (New BJA Counsel) and contract attorney Joel Feil to discuss the Applications.

88.     On August 27, 2013, the Applicants, the BJA Director, New BJA Counsel and Mr. Feil had a conference call to discuss the Applications.  New BJA Counsel stated that processing the Applications had gone on "too long."  She stated the Applicants were well known within BJA, that BJA was making it a priority to process the Applications, and expected to respond with follow-up questions within three weeks.

89.     On September 30, 2013, the participants in the August 27, 2013 conference call had a second call to discuss the Applications.  The Applicants and BJA disagreed on which regulations and statutory language applied to the Applications, and in particular, the impact of the Dale Long Act.  The Applicants asserted the new law did not apply to the Applications.

90.     On October 1, 2013, the Applicants wrote to the BJA Director and demanded they be provided with any authority under which BJA could apply certain restrictive provisions of the Dale Long Act to the Applications, as BJA had asserted the prior day.

91.     On November 1, 2013 the BJA Director wrote to the Applicants that their October 1, 2013 letter and the Applications were "under review," that BJA "very much appreciate the discussions we have had with you regarding" the Applications, and noting "when a decision has been reached," her office will "issue a determination which will include the authority for its position."

92.     During January 2014, the Applicants had e-mail exchanges with the BJA Director making clear they were still seeking immediate initial determinations under the Fast Track provision.  They wrote "Your office's silence on this matter raises obvious questions about the commitment to move these applications quickly expressed by you and your staff."   In a call during this time, the BJA Director also told the Applicants that the Applications were "still under review" and she was hoping to issue the initial determinations "shortly," but refused to give any time frame.

93.     Since late January 2014, the Applicants not received any communications from BJA or any person at the U.S. Department of Justice.

94.     A PSOBA benefit applicant injured in the terrorist attacks of September 11, 2001 received a June 2009 initial determination denying his disability claim (Attachment) and opted

for a hearing.  On information and belief, that applicant has been waiting one year for a communication from the BJA hearing officer regarding scheduling his hearing, and that officer last stated he was investigating related legal issues.

## <u>COUNT</u>
## <u>MANDAMUS TO COMPEL DEFENDANT TO PERFORM HIS LEGAL DUTIES</u>

.

### A. <u>Clear Right of the Applicants</u>

95.     The Applicants incorporate the averments of all paragraphs above as though fully set forth herein.

96.     Applicants have a clear right to the expedited processing of their claims under the Fast Track provisions, Public Law 107-37 and PSOBA at 42 U.S.C. §3796c-1, and to receive an initial determination from the Defendant "within a reasonable time."  5 U.S.C. §§ 555(b), 706(1).

97.     The intent of Congress in passing the 30-day Fast Track provision was clear – to "speed the help that they need and deserve as quickly and as painlessly as possible" and to "streamline" the PSOBA application process for the family members of fire fighters, emergency medical technicians and rescue workers who perished or suffered great injury in the aftermath of the tragic terrorist events of terrorist attacks.

98.     The Applicants have waited more than four years and seven months from the submission of the first Fast Track application on November 12, 2009 to obtain an initial determination under 28 C.F.R. § 32.23 (2005).

### B. <u>Mandatory Duty of Defendant</u>

99.     The Defendant is mandated by law to expeditiously process the Fast Track applications for PSOBA benefits.  Public Law 107-37 and the Public Safety Officer Benefit Act at 42 U.S.C. §3796c-1, and under the Administrative Procedure Act to "conclude a matter"

presented to it "within a reasonable time," 5 U.S.C. § 555(b).   His failure to do so represents

unreasonable delay and signals the "breakdown of regulatory processes."

C. <u>No Other Recourse Is Available to The Applicants</u>

100.    The extraordinary delay of Defendant and BJA in processing the Applicants'

request for benefits has spanned seven years and seven months since December 1, 2006 when

members of Congress submitted the Applicants' first applications under the normal PSOBA

procedures (non-Fast Track).

101.    BJA did not respond to the Applicants' first applications whatsoever until July 10,

2009, more than two years and seven months later.   BJA only responded after learning that the

Applicants secured legal counsel.

102.    The Defendant and BJA have shown extraordinary delay in processing the

Applicants' Fast Track Applications since November 12, 2009, more than four years and seven

months.  During that Fast Track process, for which the Applicants were the first disability benefit

applicants, BJA gave varying and tentative instructions to Applicants as to the proper signatory

to a Fast Track certification for a private sector safety officer.  These varying instructions

prompted Applicants to request additional time from BJA so they could obtain Fast Track

certifications from top officials at private hospitals (five separate certifications), a city

department (one failed attempt) and a state body (one certification) and to provide a supplement

(one).  This outreach required Applicants to expend considerable time and effort.  But

Applicants' request for time does not undermine the correct finding of Defendant's extraordinary

delay.  Subtracting the time the Applicants sought the Fast Track certifications from the four

years and seven months since they first submitted Fast Track applications, <u>three years and nine</u>

<u>months represents BJA's processing time of the Fast Track Applications.</u>

103.    When considered in the context of the entire seven years and seven months

beginning December 1, 2006 when the time the Applicants sought the Fast Track certifications,

six years and six months represent BJA's processing of the Applicants' benefit requests.  The

Applicants' diligence in securing the varied certifications is just 14 percent of the total seven

years and seven months.

104.    The processing the Applicants' Fast Track Applications from the time they

submitted their final Fast Track certification (from REMSCO) on July 6, 2011 has spanned more

than two years and eleven months, an extraordinary delay, especially given Fast Track requires

BJA to provide the benefit within 30 days, and especially given that BJA has issued other initial

determinations that have averaged a mere four and a half pages in length (see Attachment).

105.    From the time BJA notified the Applicants that it would not accept their last and

final Fast Track certification (from REMSCO) on December 12, 2012, BJA's processing time for

issuing the initial determination has been more than one year and six months, an extraordinary

delay.  This delay is inexplicable, given the Defendant's public pronouncement in May 2013 that

BJA would be reorganized to "streamline" and  "expedite the claims process."  Congress

provided a timetable and indication of the speed with which it expects the Defendant and BJA to

process the Fast Track Applications.

106.     Despite the Applicants' repeated demands for an initial determination on their

Applications, the last communication with BJA of any kind was more than five months ago.

107.    These facts establish the bad faith of the Defendant and BJA in processing the

Applications.

108.    Because BJA already awarded PSOBA benefits to the families of non-governmental

Fast Track applicants who were killed in the terrorist attacks of September 11th, the Applicants

rightly believe the Defendant and BJA are discriminating against them on the basis that the

Applicants were merely rendered permanently disabled, rather than killed on September 11, 2001.[13]  The Applicants reasonably conclude that BJA is simply waiting for Applicants to give up on their Applications, or die.  The inexplicable delays over the past seven years have negatively impacted the health and welfare of these disabled September 11th heroes, each of whom suffer with serious chronic ailments.  Applicants have no other remedy under law because they cannot proceed with the administrative process without the initial determination by BJA.  It is futile for the Applicants to continue to seek a determination from BJA through the administrative process.

109.    The Applicants fully expect continued processing delays even <u>after they receive an initial determination</u>, should that ever occur, given their understanding that a fellow September 11, 2001 rescue worker who <u>did</u> receive an initial determination (Attachment) reports that he has been waiting one year to even schedule a hearing before a BJA hearing officer to review his application.

WHEREFORE, Marvin Bethea, Michael Roberts, and Bonnie Giebfried pray for this court to assist them in obtaining an initial determination of the Applications, and seek judgment as follows:

---

[13] "Ms. Janke I would like to take this time to APOLOGIZE for being injured on September 11th.  It seems that every agency or insurance provider that I have had to deal with has made every effort to make me feel like it was my fault for being injured not **Killed.** The stress I have from this is why I feel my nightmares of that day won't go away. You or no one else knows what it was like to see the dismembered bodies of innocent people that littered the West Side Highway and have to drive over them to get to your staging area. Or when the second building started to collapse using your body to protect a elderly woman from the debris and I hope you never will. If I had died that day compensation would have been made to my **LOVED ONES** and everyone else could have washed their hands and went on.  But I didn't." Letter from Michael Roberts to Hope Janke, October 16, 2009 (emphases in the original).

A.  Finding under the Declaratory Judgment Act that Defendant Holder and BJA failed to timely process the Fast Track applications of the Applicants in violation of Public Law 107-37, the Public Safety Officer Benefit Act at 42 U.S.C. §3796c-1, and 5 U.S.C. § 555(b);

B. Compelling Defendant Holder and BJA to timely process the Fast Track Applications of the Applicants and issue an initial determination letter as to their claims within 15 days of such order;

C.  After issuing the initial determination letter, compelling Defendant Holder and BJA to timely process the Fast Track Applications of the Applicants until the benefits are provided or the claims exhausted, under Public Law 107-37, the Public Safety Officers' Benefit Act at 42 U.S.C. §3796c-1 and 5 U.S.C. § 555(b), including:

1) compelling Defendant and BJA to set a hearing date before a hearing officer and that such date is within 30 days of receipt of the Applicants' opting for a hearing;

2) compelling Defendant and BJA to require the hearing officer to issue a determination within 60 days of such hearing; and

3) compelling Defendant and BJA to provide the Applicants a final determination following a determination by a hearing officer within 30 days of such determination by the officer;

D. Declaring and establishing that this Court will retain jurisdiction to enforce such order compelling the Defendant and BJA to process the Applications as requested and until exhausted, in the event that Defendant Holder and BJA violate such order of this Court, as granted pursuant to this action, and

E.  Awarding Applicants their costs and expenses of this litigation, including reasonable attorneys' fees pursuant to 28 U.S.C. §2412 or otherwise.

Dated:   July 3, 2014

Respectfully submitted,

_____/s/_____
Regina M. Markey, Esquire
Counsel for Plaintiffs
Beins Axelrod, PC
1625 Massachusetts Avenue, NW
Suite 500
Washington, DC  20036
rmarkey@beinsaxelrod.com
Ph:   (202) 328-7222
Fax: (202) 328-7030
DC Bar No. 444717

_____/s/_____
Jonathan G. Axelrod, Esquire
Counsel for Plaintiffs
Beins Axelrod, PC
1625 Massachusetts Avenue, NW
Suite 500
Washington, DC  20036
jaxelrod@beinsaxelrod.com
Ph:   (202) 328-7222
Fax: (202) 328-7030
DC Bar No. 210245

Attachment:  Redacted 2009 BJA Initial Determination Letter to September 11, 2001 First
Responder